UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAVID RYAN, et al. ) | |
| ) | |
| Plaintiffs, ) | Civil Action: |
| ) | No. 09-10653-JGD |
| v. ) | |
| ) | |
| SEARS, ROEBUCK and CO., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFFS' MEMORANDUM OF REASONS IN OPPOSITION
TO DEFENDANTS' MOTION FOR LEAVE TO FILE
THIRD-PARTY COMPLAINT AGAINST
<u>MUELLER ELECTRIC COMPANY WHICH IS IN RECEIVERSHIP IN OHIO</u>**

**FACTS**

The defendants claim in support of their Motion that they "have only recently learned" the plaintiffs' "sole theory of liability" and that they have "just recently learned" that the metal clips on the incident battery charger were manufactured by Mueller Electric Company (hereinafter "Mueller"), from which ACME Electric Corporation (hereinafter "ACME") purchased the subject clips as component parts.

This case was commenced against the defendant, Sears, Roebuck and Co., nearly three years ago. The defendant, ACME, was not added as a party defendant until December 8, 2008, for the reason that Sears had been unable to identify the manufacturer of the incident battery charger as ACME until shortly before that date in supplemental answers to interrogatories. In its original answers, Sears had been unable to identify the manufacturer of the charger that it had sold to the plaintiff, David Ryan's employer.

Following the addition of ACME as a party defendant, Sears' attorneys entered their appearance on its behalf.

The defendants imply that their failure to implead Mueller in a timely fashion is somehow the plaintiffs' fault because the plaintiffs' discovery included inquiries about a "spark protection system." The defendants argue that shortly after the Court Status Conference of February 8, 2010, they were informed for the first time that "the sole theory of liability is that the battery charger's metal clips (used to attach the charger to a battery) were negligently designed or manufactured." They assert that "(p)reviously, based on the nature of the plaintiffs' discovery requests and discussions with plaintiffs' counsel, the defendants understood the plaintiffs' theory of liability was that the subject battery charger should have been equipped with spark protection technology." They then go on to falsely claim that the plaintiffs' discovery requests asked no questions related to the manufacture or design of the metal clips.

Firstly, the defendants' allegations with regard to the plaintiffs' liability theories and related alleged conversations with plaintiffs' counsel are disingenuous, the plaintiffs having asked numerous questions with regard to the clips during discovery and plaintiffs' counsel having had no conversations with anyone in connection with "spark protection" technology being a theory of liability. Secondly, of course, the plaintiffs are under no obligation to inform the defendants of their theories of liability at any time or in any manner other than those prescribed by the *Federal Rules of Civil Procedure*, i.e. in an expert report served in accordance with the provisions of *F.R.C.P. Rule 26(a)(2)*.

At no time did plaintiffs' counsel have a conversation with any defense counsel or anyone else stating that the plaintiffs' theory of liability was that the subject battery

2

charger should have been equipped with "spark protection" technology. From day one, the plaintiffs' theory of liability has been based upon the failure of one of the metal clips that attached the incident charger to the battery it was charging at the time of the plaintiff, David Ryan's terrible accident. Contrary to the defendants' claims that "the plaintiffs' discovery requests asked no questions specifically related to the manufacturer or design of the metal clips," the plaintiffs' attorney attempted to obtain discovery with regard to the clips by scheduling the defendants' *F.R.C.P. Rule 30(b)(6)* depositions for May 18, 2009 and May 22, 2009. The Notices of Taking Depositions (attached hereto as Exhibits A and B) contained schedules seeking testimony and documents with respect to the following:

> "19.   The cost to ACME (Sears) of each component part of the subject battery charger model specifically including but not limited to the metal clips used to attach the charger to the battery posts.
>
> 20.   The design of said battery charger clips.
>
> 21.   The manufacture of said battery charger clips.
>
> 22.   The materials out of which said battery charger clips were manufactured."

At defense counsel's request, said depositions did not proceed as scheduled and were continued by agreement indefinitely. Despite repeated requests, not until plaintiffs' counsel served Re-Notices of said depositions (attached hereto as Exhibits C and D) for January 27, 2010 and January 28, 2010, did the depositions proceed. Again, the schedules accompanying the Notices of Taking Depositions sought testimony and documents in connection with the clips set forth above plus additional information with regard to the clips as follows:

3

"19.  The cost to ACME (Sears) of each component part of the subject battery charger model specifically including but not limited to the metal clips used to attach the charger to the battery posts.

20.  The design and specifications of said battery charger clips and what other clip designs were considered.

21.  The manufacturer and suppler of said battery charger clips.

22.  The materials out of which said battery charger clips were manufactured.

23.  The cost differences between the battery clip design used and other clip designs.

24.  The environments in which the subject battery charger was designed to be used including garages.

25.  The types of failure modes noticed regarding the clips on the subject battery charger.

26.  The design useful life of the subject battery charger.

27.  The design useful life of the subject battery charger clips.

28.  The considerations given to the material of the subject battery charger clips."

At the taking of the defendants' Rule 30(b)(6) depositions, the defendants' designees were specifically asked about one of the clips on the incident battery charger having failed, the materials out of which the clips were made, who designed the clips, testing of the clips, the engineering basis for the design, design drawings, specifications, the length and diameter of the spring, the length of the legs of the spring, the wire diameter, the wire material, the design load, the effect of environment on the clips, the design useful life the clips, and the failure of the clip on the incident charger. The defendants' designees could provide no information in response to these questions.

With regard to the defendants' claim that they were under the impression that the plaintiffs' theory of liability was that the charger should have been equipped with a "spark protection technology," the plaintiffs never had such a theory, and their counsel certainly would not have discussed the matter with defense counsel.  Plaintiff's counsel did explore in discovery Sears' "spark protection" system as referenced in its internet advertising in connection with certain chargers manufactured after the incident charger, but this inquiry never rose to the level of a theory of liability.  The fact that the defendants somehow latched onto it as the plaintiffs' theory is not the plaintiffs' problem and the plaintiffs certainly can't be blamed for ACME's failure to timely identify the manufacturer of the clips with which it contracted to supply clips for the battery chargers it manufactured.

The defendants go on to claim that they were not in possession of the charger notwithstanding the fact that in 2007 Sears had a "product liability investigator" examine and photograph the charger and inspect, manipulate, and photograph its clips.  In addition, on two occasions in 2009 and 2010 defense counsel was offered the opportunity to examine the charger and clips again at Exponent, the plaintiffs' expert's former office in Natick, MA, before it was to be shipped to said expert's current office in Maryland.  Defense counsel declined to accept these offers before the charger was shipped, and the defendants have made no requests for a second examination of the charger.

Defense counsel boldly state that "(b)oth the plaintiffs and the defendants desire that Mueller be added to the case…" notwithstanding the fact that on the day that defendants filed their motion in Court, plaintiffs' counsel had informed defense counsel by telephone before said filing that he did **not** want Mueller added to the case in view of

its being in receivership, which fact would cause undue delay so as to prejudice his clients. Although plaintiffs' counsel had previously joined in a letter to the Court (Dein, J.) expressing interest in adding Meuller as a party, that was before he learned that Mueller was in receivership and that the Receiver would oppose Mueller's involvement in the case, no doubt resulting in undue delay and prejudice to the plaintiffs in the prosecution of this action.

Defense counsel then go on to claim that "(t)here will be no need to extend existing deadlines for the present parties" if Mueller were added. That, of course, is clearly not the case. The plaintiffs, in fact, have had to file a Motion to Extend Expert Report Service Deadline beyond March 31st, the date for service of his report, because their expert cannot perform the required metallurgical testing set forth in his Proposed Protocol, attached hereto as Exhibit E, while defendants' motion to implead is pending due to spoliation concerns in the event that defendants' motion were allowed. Also, defense counsel have declined to agree to plaintiffs' expert's proposed testing protocol without Court approval, thereby requiring plaintiffs to file a Motion for Approval of Proposed Expert Testing Protocol. The plaintiffs' expert had planned to complete the necessary testing well in advance of March 31 but for defendants' motion to implead and defense counsel's objection to his proposed testing protocol.

It is clear that if the defendants wanted to implead Mueller, the manufacturer of the clips ACME purchased from Mueller, ACME should have determined the identity of its own parts supplier much earlier. To try to blame its failure to move to add Mueller earlier based upon confusion as to the plaintiffs' theory of liability is absurd. All parties have known since 2007 when Sears' expert examined and photographed the incident

6

charger and clips that one of them had failed and, as noted in the Fire Marshall's report, had caused the spark that resulted in David Ryan's catastrophic injuries.

## CONCLUSION

For the reasons stated, it is respectfully requested that Defendants' Motion for Leave to File Third-Party Complaint be denied.  The defendants will not be prejudiced by said denial and, of course, they and their insurers can pursue Mueller and its insurers in a separate action, which fact they have acknowledged.  The scheduling of the remainder of this case including mediation, if the parties agree, and trial should not be delayed for an extended period of time by adding a party in receivership whose Receiver has specifically refused to consent that it be added.

Respectfully submitted,

Plaintiffs,
By their attorney,

/s/ John F. Finnerty, Jr.
John F. Finnerty, Jr.
BBO # 166540
Finnerty Law Offices
56 Bayberry Way
Osterville, MA 02655
(508) 428-1234
jff@finertylawoffices.com

Dated: March 21, 2010

## CERTIFICATE OF SERVICE

Service of the within document is being made by the Court upon counsel for the defendants by automatically generating and sending a Notice of Electronic Filing by e-mail to ECF users of record in this case.

/s/ John F. Finnerty, Jr.
John F. Finnerty, Jr.